IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 10-cv-02605-MSK-MJW

KIM ANDREWS,

              Plaintiff,

v.

THE GEO GROUP, INC.,

              Defendant.

---

**OPINION AND ORDER GRANTING IN PART AN DENYING IN PART
MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court on a Motion to Dismiss and Motion for

Summary Judgment[1] (**#63**) filed by the Defendant the GEO Group, Inc. ("GEO"), with

supplemental authority (**#76**, **#78**), to which the Plaintiff Kim Andrews responded (**#70**) and

GEO replied (**#74**). Having considered the same, the Court **FINDS** and **CONCLUDES** the

following.

---

[1]As a technical matter, certain components of GEO's motion raise jurisdictional issues
normally subject to resolution via a motion to dismiss, with the remaining components raising
factual arguments amenable to resolution via summary judgment. The Court acknowledges this
distinction, but, for practical reasons, treats the entire motion as one for summary judgment.

## FACTS

The following facts are either undisputed or, where disputed, taken in the light most favorable to Ms. Andrews.

### A. Background

GEO operates an immigration detention facility in Aurora, Colorado, housing aliens awaiting deportation.  Ms. Andrews, a black female, was employed as a Detention Officer at the facility from 2000 until her termination on October 23, 2008.  Detention Officers perform a range of tasks at the facility, regularly rotating through various assignments every few months.  Up to the events at issue here, Ms. Andrews consistently received positive performance evaluations and job commendations.

Ms. Andrews suffers from a variety of chronic medical conditions, including lupus, fibromyalgia, depression, and migrane headaches.  These conditions can result in temporary "flare ups" of debilitating weakness, pain, and fatigue.  As a result, since 2003, Ms. Andrews has been permitted to take intermittent medical leaves, pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615 *et seq.*, as her symptoms warrant.

Although Ms. Andrews recites and relies upon facts occurring as early as 2006, the Court elects to begin its factual recitation in 2008, and will address earlier events only to the extent relevant in its analysis.  In January 2008, GEO advised Ms. Andrews that she would be reassigned from the Intake Unit to a Housing Unit assignment.  She inquired as to the reasons for that decision.  In a written response to that inquiry, GEO explained that "the intake post . . . requires the assigned officer to be present for duty on a consistent basis."  It pointed out that

between mid-October 2007 and January 8, 2008, "you have missed 13 work days,"[2] which "hampered" GEO's operations by requiring it to reassign intake-qualified employees from other assignments and require other employees to work overtime.  GEO concluded that "a more permanent solution had to be made in order to maintain some type of consistency in the Intake Department," and thus, concluded that reassignment of Ms. Andrews to the housing unit would "meet your needs and meet the needs of the facility."

On January 11, 2008, only a few days later, Ms. Andrews suffered an on-the-job injury to her shoulder.  Her doctor released her to work with a lifting restriction, and GEO informed her that it could accommodate those restrictions via a "transitional light duty" assignment to the dorm unit.  Ms. Andrews thus returned to work on or about January 14, 2008.

On January 19, 2008, she suffered another on-the-job injury, this time injuring her neck and back.  However, it appears that Ms. Andrews did not immediately report this injury.  Rather, she went to a hospital emergency room for treatment on January 20, 2008, and reported to GEO's worker's compensation medical provider on January 22, 2008, complaining of continued pain. This January 22 visit was the first time that GEO was notified of her January 19 injury. Upon learning of the injury, GEO placed Ms. Andrews on paid administrative leave, pending an investigation into the circumstances of the January 19 injury and a determination of whether she could perform the duties of her position with the restrictions imposed by her doctor (including the question of whether she could "defend herself" against a violent inmate).[3]  The record is

---

[2]Ms. Andrews states that some of those absences were taken as protected  FMLA leave due to her medical condition.

[3]On the same date, GEO issued a memo directing that Ms. Andrews (and a second named employee) not be permitted to enter the facility.  This appears to be pursuant to a corporate

somewhat unclear as to the extent of GEO's investigation into her ability to perform the duties of her position,[4] but within a few days, GEO decided that it did not have any positions that met her limitations. Thus, it placed her on worker's compensation leave, where she would not receive her regular pay but would receive worker's compensation benefits.

At some point in or about March 2008, Ms. Andrews filed a complaint with the U.S. Department of Labor's Wage & Hour Division, complaining that her transfer from the Intake Department to the Housing Unit, allegedly due in part to absences she took under the FMLA, violated her FMLA rights. On March 19, 2008, the Department of Labor wrote to GEO, informing it of Ms. Andrews' complaint and inquiring about certain information. On March 25, 2008, GEO wrote to Ms. Andrews, advising her that "your current leave of absence will expire on April 7, 2008," and directed her to advise GEO of her intent to return to work and to provide a Fitness for Duty Certification from her doctor. On March 27, Ms. Andrews responded that she did intend to return, but also requested a 30-day extension of her leave. That same date, Ms. Andrews filed a charge of discrimination with the EEOC, alleging race discrimination, disability discrimination, and retaliation, reciting some of the events described above, as well as others. GEO received a copy of that charge on March 31. That same day, it denied her request for an extension of her leave and directed her to return to work on April 8.

---

policy that employees on paid leave are not permitted in the facility.

[4]A January 22, 2008 e-mail written by Assistant Warden Dawn Ceja states "I would agree it would be a huge liability [to allow her to work "in a correctional environment if she can't defend herself"] and although she could perform some and/or the minimum job requirements, we put ourselves at risk if we allow her to work." It is not clear whether Ms. Ceja's assessment that "she could perform some and/or the minimum job requirements" was intended to articulate an actual finding as to that issue or, coming on the same date that GEO learned of the January 19 injury, was intended to be a more hypothetical statement.

Also on March 31, the Warden of the facility drafted a memo recommending that Ms. Andrews be terminated.  That memo summarized the events leading up to Ms. Andrews' current leave, contains a section entitled "Summary: Ms. Andrews has filed a complaint with the Department of Labor for FMLA violation" and "has filed a charge of discrimination," and then states: "Recommendation: Ms Andrews continues to be covered under workman's compensation indefinitely, I am recommending she be terminated."  The Warden apparently re-drafted the memo on April 8, 2008, omitting the references to Ms. Andrews' complaints and appending some text to the recommendation section, which now reads: "I am recommending she be terminated for not being able to perform the essential duties required by the Detention Officer Job Description."  On April 16, 2008, the Human Resources department notified the Warden that "I'm going to hold off on the term[ination] request for [Ms. Andrews] until we figure out if we are going to mediation. . . .  I don't want her termination to go forward until we get a better handle on her current issue."  (Correspondence from others in the Human Resources department in the ensuring months make mention of Ms. Andrews having a "termination pending.")

Meanwhile, Ms. Andrews reported for work on April 8.  She explained her medical restrictions to the supervisor on duty, and he inquired whether she would be able to work an assignment in the control or lobby areas.  Ms. Andrews replied that she could.  The supervisor then contacted the Warden, who instructed him to have Ms. Andrews report to the facility's medical provider to obtain "a new notice of restrictions before being allowed to work."  Ms. Andrews stated that she had visited the provider the day before and was advised of the same restrictions, but agreed to comply with the request.  It is not entirely clear from the record what occurred thereafter, but it appears that Ms. Andrews continued to remain out of work for several

more months.

On August 13, 2008, Ms. Andrews provided GEO with a doctor's release to return to work.  On September 5, 2008, GEO wrote to Ms. Andrews, informing her that it could accommodate her restrictions and that she could return to work on September 8, 2008.  Ms. Andrews apparently returned to work at that time, although the nature of the "restrictions" that she was subject to and the assignment she was given consistent with those restrictions is not clear from the record.

On or about September 30, 2008, Ms. Andrews' doctor (apparently a different doctor than the one from August 2008) released her to return to work, albeit with certain "permanent restrictions" on the tasks she could perform.  On or about October 14, GEO sent a copy of those restrictions, along with a job description, to Dr. Quick, apparently a physician with GEO's worker's compensation medical provider, asking Dr. Quick to opine as to whether or not Ms. Andrews could perform the functions in the job description given her restrictions.[5]  Dr. Quick responded that Ms. Andrews could not perform the following functions (and, conversely, stated that she could perform all other functions):

- maintain custody, care and **control** of inmates/detainees;[6]

- Coordinates and monitors detainee movements, conducts counts,

---

[5]Specifically, GEO requested that Dr. Quick "review the list [of functions] and advise whether Ms. Andrews is able to perform each function. If you believe an accommodation is required for Ms Andrews to perform each function or you have any comments that might assist in determining an appropriate assignment for Ms. Andrews, provide specific accommodation suggestions or comments in the blank provided under each function."

[6]Dr. Quick circled certain words in the description of certain functions that Ms. Andrews could not perform, and at other times, he made certain notes.  The Court will use bold text to indicate those words Dr. Quick circled, and will set forth his written notes in brackets.

and provide **emergency response** as needed;

• Serves as member of special teams to respond to **emergencies** as required;

• Lifting and carrying of equipment or materials and other objects associated with the security environment (e.g. from **11-20 lbs, 21-40 lbs.** [can], **41-60 lbs, 61+ lbs.** [cannot] up to 30% of the time); and

• Pushing or pulling up to **1-40 lbs.** [can], **41-60 lbs., 61+ lbs.** [cannot] as much as 30% of the time.

On October 23, 2008, based on Dr. Quick's findings, and apparently without any further discussion or investigation, GEO terminated Ms. Andrews' employment, stating that "you are no longer able to perform the essential functions of a detention officer" and that "there are no reasonable accommodations that will permit you to perform the duties of a detention officer with the physical limitations provided by Dr. Quick."

In the meantime, on October 9, 2008, agents from the Bureau of Immigration and Customs Enforcement ("BICE"), the agency that contracts with GEO to house the detainees, sought to interview Ms. Andrews as part of an investigation into whether staff at GEO had used racial slurs to address detainees.  Ms. Andrews gave a sworn statement that she had "second hand information" from detainees and other officers that had heard GEO employees using various racial slurs against detainees and co-workers (including that "they had called a black officer Aunt Jamima and Uncle Ben"), but the affidavit makes clear that Ms. Andrews never personally witnessed such slurs being used.

Based on these facts, Ms. Andrews asserts eight claims for relief: (i)-(iv) violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, in that GEO created a racially hostile working environment, discriminated against her in the terms and

conditions of her employment and in making the decision to terminate her, and retaliated against her for complaining of race discrimination; (v) and (vi) violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, in that it failed to grant her a reasonable accommodation and retaliated against her for complaining of disability discrimination; (vii) common-law wrongful termination in violation of public policy; and (viii) common-law outrageous conduct.

GEO now seeks summary judgment **(# 63)** on all of Ms. Andrews' claims as set forth below.

**ANALYSIS**

**A.  Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### B.  Race discrimination claims

Although Ms. Andrews brings her race discrimination claims under both Title VII and §1981, the Court sees little value in addressing the statutes separately.  Title VII claims are subjected to a somewhat more strict statute of limitations and pre-suit exhaustion requirement, but the substantive analysis under either statute is the same.  *See Felix v. City and County of Denver*, 729 F.Supp.2d 1243, 1252 (D.Colo. 2010), *citing Fincher v. Depository Trust and Clearing Corp*., 604 F.3d 712, 720 (2d Cir. 2010) (retaliation); *Faragalla v. Douglas County School Dist*., 411 Fed.Appx. 140, 152 (10th Cir. 2011) (hostile environment harassment); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 n. 3 (10th Cir. 1997).  Accordingly, the Court will examine Ms. Andrews' claims under both statutes simultaneously.

### 1.  Hostile work environment

To establish a claim for a racially-hostile work environment, Ms. Andrews must demonstrate: (i) that the workplace was "permeated with discriminatory intimidation, ridicule, and insult"; (ii) based on race; (iii) that is both objectively; (iv) and subjectively; (v) so severe

9

and pervasive as to alter the terms and conditions of employment.  *Hernandez v. Valley View Hosp. Assn.*, 684 F.3d 950, 957 (10th Cir. 2012).  In determining the severity of the conduct, the Court considers factors such as its frequency, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonable interferes with an employee's work performance.  *Id.* at 957-58.

GEO primarily contends that Ms. Andrews cannot establish a hostile environment claim because none of the racially derogatory comments that may have been made were directed at her.  As a factual matter, this is correct: Ms. Andrews has identified a single, arguably-racial epithet that was directed at her by a co-worker,[7] but this event occurred in April 2006, outside of even §1981's four-year limitations period.  (Moreover, the record reflects that GEO suspended the co-worker for five days as punishment for the remark.)  Ms. Andrews does not contend that anyone else ever used a racial epithet directed at her, nor even in her presence.  However, she relies heavily on the fact that the use of racially-derogatory terms by some employees in the facility was common and well-known.[8]

_____

[7]Upon seeing that Ms. Andrews was getting ice for a co-worker, Officer Colunga, another co-worker stated "I see Colunga's got himself a slave to go out and get him ice."  Although the Court recognizes that the concept of "slavery" has somewhat transcended race in modern colloquial speech – *i.e.* people of all races are commonly referred to as "slaves" to various masters, both concrete ("he's the office's coffee slave") and abstract (being a "wage slave") – it will nevertheless assume that the comment was particularly disturbing to Ms. Andrews given her race.  *See Tademy*, 614 F.3d at 1146 ("we need not explore America's history of race relations to understand why an African-American would be offended by [an e-mail distributed to co-workers stating 'keep an eye on the slaves, seriously']").

[8]Ms. Andrews also contends that GEO engaged in racial segregation of inmates, confining detainees from African countries into a single dormitory "invested with mold and other environmental problems."  Given the wide deference that the Court must grant correctional (and here, quasi-correctional) facilities in managing their operations, the Court is reluctant to draw particular inferences from the fact that geographically- or culturally-similar detainees are housed

This Court does not necessarily reject the notion that a hostile environment claim may be stated by an individual who was never personally the subject of racial harassment, so long as she was aware (directly or indirectly) of such harassment being directed at others.  *See generally Hernandez*, 684 F.3d at 959 ("evidence of a general work atmosphere, including evidence of harassment of other racial minorities may be considered in evaluating a claim, as long as the plaintiff presents evidence that she knew about the offending behavior"), *citing Harris v. Forklift Systems,* 510 U.S. 17, 23 (1993) *and Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1146 (10th Cir. 2008); *see also Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995).  Indeed, the Tenth Circuit has suggested, albeit in *dicta*, that "[e]ven a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere where such harassment was pervasive." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416 (10th Cir. 1987), *quoted in Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379 (10th Cir. 1991).

However, Ms. Andrews' hostile environment claim is doomed by a lack of proof of any timely instances of such harassment taking place.  Giving Ms. Andrews the benefit of § 1981's four-year statute of limitations, *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 383-84 (2004), and the rule that a hostile work environment claim is rendered timely where any single instance of harassment occurred within the limitations period, *National RR Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002), Ms. Andrews must show that at least one instance of the alleged pattern of racially-harassing conduct occurred on or after October 26, 2006 – the date four years prior to Ms. Andrews' commencement of this action.  Having carefully reviewed Ms. Andrews'

---

together.

supporting evidence, the Court finds that she has not done so.

As mentioned above, Ms. Andrews herself was a witness to only one instance of a racially-harassing comment, and that occurred in August 2006.  Thus, to prove the existence of a hostile environment, she is forced to rely on the percipient testimony of others.[9]  Most notably, Ms. Andrews supplies an affidavit of Velma Underwood.  Ms. Underwood states that "throughout my employment with GEO [*i.e.* between at least 2003 and 2008], detainees frequently complained about being called racial slurs by GEO's detention officers."  However, every instance recited by Ms. Underwood in her affidavit took place prior to October 2006. *Docket* # 70, Ex. 52, ¶ 3 (detainee complaint dated May 27, 2006), ¶ 9 ("in August 2006," the NAACP "filed a complaint on my behalf . . . that GEO's officers were using racial slurs and epithets against detainees").  Ms. Underwood does not detail any instance of a racial slur being used after October 2006, and thus, the Court does not consider the conclusory assertion that such conduct occurred "throughout my employment" – *i.e.* until 2008 – to be a well-pled fact for summary judgment purposes.

Ms. Andrews' brief does not point to any other evidentiary material supporting her contention that GEO employees frequently used racial epithets at work, and thus, the Court finds that she has not demonstrated the use of any such epithet during the limitations period, such that

_____

[9]Ms. Andrews' testimony as to what others may have told her they heard is classic hearsay: a statement made by someone other than the declarant (*i.e.* the person reporting hearing the slur), offered for the truth of the matter asserted (*i.e.* that the slur was uttered).  Fed. R. Evid. 801(c), *Powell v. Laborers Union*, 426 Fed.Appx. 615, 621 (10th Cir. 2011) (unpublished) (employee's recitation of slurs related to him by co-worker was inadmissible hearsay, but testimony by co-worker about hearing the slurs might be admissible).  Hearsay statements do not demonstrate a genuine issue of fact sufficient to deny summary judgment. *Johnson v. Weld County*, 594 F.3d 1202, 1210 (10th Cir. 2010).

it could support a claim for a racially-hostile working environment.

Ms. Andrews contends that a grab-bag of other acts demonstrate a racially-hostile working environment, including: (i) that the co-worker who used a racial epithet against her in 2006 was subsequently rude to her in 2007; (ii) that GEO required black employees to conduct strip searches of inmates when white workers refused to do so; and (iii) GEO failed to accommodate the medical needs of black employees but did so for white employees, among other things. The Court cannot say that such conduct, even if assumed to have occurred and to be racially-motivated, is so "severe and pervasive" (even when aggregated together[10]) as to give rise to a hostile environment occurring after October 2006. The instances do not appear to be particularly numerous or frequent, they are certainly not humiliating or threatening (much less even so patent as an offensive utterance), nor is there any indication that they particularly affected Ms. Andrews' work performance.

Accordingly, the Court finds that Ms. Andrews has not demonstrated a triable claim of a racially-hostile working environment, and thus, GEO is entitled to summary judgment on this claim.

2.  Disparate treatment

Ms. Andrews contends that several different employment actions taken against her, up to

---

[10]Ms. Andrews would suggest that the Court aggregate these events with the untimely racial epithets, pursuant to *Morgan*, which permits the Court to consider untimely acts of harassment as "background evidence in support of a timely claim." 536 U.S. at 113. The Court finds that the enumerated acts (and the other timely acts alleged by Ms. Andrews) are not necessarily part of the same pattern of harassment embodied by the racial epithets; the former are primarily acts perpetrated by GEO management, whereas the latter are acts perpetrated by GEO employees. Moreover, Ms. Andrews is not using the racial epithets as background evidence to "support . . . a timely claim" that would otherwise be actionable on its own; she is relying on the epithets to **create** a claim that the timely conduct itself would not otherwise support.

and including her termination, were racially motivated.

To establish a claim for race-based disparate treatment, Ms. Andrews must first establish a *prima facie* case by showing: (i) that she is a member of a protected class; (ii) that she suffered an adverse employment action; and (iii) that action occurred in circumstances giving rise to an inference of discrimination; the burden then shifts to GEO to articulate a legitimate, non-discriminatory reason for the action and Ms. Andrews bears the ultimate burden of showing that reason to be a pretext for discrimination. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir.2007); *St Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08 (1993).

Ms. Andrews stumbles somewhat on the second element, as many of her alleged adverse employment actions – her assignment from the Intake Unit to the Housing Unit, a written reprimand issued in 2007 for bringing her weapon into the facility, the requirement that black employees conduct strip searches – are not actionable.  For purposes of a disparate treatment claim, an adverse action is one that "constitute[s] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1224-25 (10th Cir. 2006), *quoting Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005).  Thus, things like written reprimands are not considered to be adverse employment actions absent a showing – which Ms. Andrews does not make here – that the reprimand effected some other material change in her employment status.  *See DeWalt v. Meredith Corp.*, 288 Fed.Appx. 484, 493 (10th Cir. 2008) (unpublished).  Similarly, being assigned to perform tasks that are part of the employee's normal job duties – *i.e.*

work in the Housing Unit or performing strip searches – are not adverse actions.[11]  *See Piercy v. Maketa*, 480 F.3d 1192, 1204 & n.13 (10th Cir. 2007) (female employee given "the additional duties of patting down the female inmates at CJC (which the male guards did not have to do) does not rise to the level of an adverse employment action").

Of the alleged adverse actions identified by Ms. Andrews, the Court finds that only her ultimate termination is truly adverse.  Thus, the Court turns to the third element of the *prima facie* case: whether Ms. Andrews can show that the termination occurred in circumstances giving rise to an inference of race discrimination.  An employee may satisfy this element in a variety of ways – *e.g.* by showing "actions and remarks by the decisionmakers that could be viewed as reflecting a discriminatory animus, preferential treatment given to employees outside the protected class, . . . or, more generally, upon the timing or sequence of events leading to plaintiff's termination."  *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).

Ms. Andrews offers relatively little evidence to suggest that her termination was the result of her race (as opposed to her disability or her protected complaints, discussed below).  She points to certain comments made by certain GEO representatives, including Maria Culbertson, a Human Resources employee, who commented to another Human Resources representative to "please keep in mind [Ms. Andrews] is a 'special' person we are dealing with," or Lt. Horton, who in or about April 2008 allegedly stated "two down and a few more to go," allegedly referring to the termination (or anticipated termination) of certain black female officers

---

[11]In this regard, the Court is unpersuaded by Ms. Andrews' citation to Judge Babcock's November 17, 2011 decision in *Underwood v. The GEO Group*, D.C. Colo. Case No. 10cv-306. That decision does not consider the question of whether the cited events were adverse employment actions.

that he disliked.  But even assuming that these remarks are indeed racially-based, Ms. Andrews

has not shown that either Ms. Culbertson or Lt. Horton was the "decisionmaker" on the decision

to terminate her.  Rather, the record seems to reflect that Warden Hunt drafted the April 2008

termination memos, communicated with Dr. Quick, and signed the letter terminating Ms.

Andrews.  However, Ms. Andrews has pointed to no evidence suggesting that Warden Hunt

harbored any racial animus.

Ms. Andrews argues that GEO gave more favorable treatment to white employees that

had medical restrictions – Officer McCune (whom Ms. Andrews states was pregnant) and

Officer Woods (whom Ms. Andrews states "sustained a work place injury caused by a leg/hip

problem).  However, she does not cite to any particular evidence regarding these individuals.  In

the absence of supporting evidence, the Court does not consider Ms. Andrews' contentions.  Fed

R. Civ. P. 56(c)(1)(a); *BancOklahoma Mort. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1097

(10th Cir. 1999).

Accordingly, the Court finds that Ms. Andrews has failed to demonstrate a *prima facie*

case with regard to her claims of disparate treatment based on race, and thus, the Court grants

summary judgment to GEO on those claims.

### C.  Retaliation

Both § 1981 and Title VII prohibit retaliation against an employee who makes complaints

of race discrimination.  The analysis of a retaliation claim follows a similar burden-shifting

framework as that discussed above: the employee has the initial burden of demonstrating a *prima*

*facie* case of retaliation; the employer must respond with a legitimate, non-retaliatory reason for

the adverse action; and the employee bears the ultimate burden of showing that the proffered

reason is a pretext for retaliation.  *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011).  However, the *prima facie* case for a retaliation claim is somewhat different from the race discrimination *prima facie* case.  To establish a *prima facie* case of retaliation, Ms. Andrews must show: (i) that she engaged in protected conduct; (ii) that she suffered an adverse employment action; and (iii) that there is a causal connection between the protected conduct and the adverse action.  *Id.*  The concept of what constitutes an adverse action for purposes of a retaliation claim is somewhat broader than that in a race discrimination claim; for retaliation purposes, an adverse action is one which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006).

Ms. Andrews largely asserts the same adverse employment actions as supporting her retaliation claim – *e.g.* her assignment to the Housing Unit, having to perform strip searches, etc.  Even under the more generous *Burlington Northern* standard, the Court finds these events are not sufficiently adverse.  *Burlington Northern* found that an employee's contention that she was reassigned from the relatively easy "prestige"  job of operating a forklift to the indisputably "more arduous and dirtier" job of track laborer could amount to an adverse action, even though both tasks were within the employee's job description.  *Id.* at 71.  But here, Ms. Andrews has not presented any evidence that the Housing Unit assignments were objectively "more undesirable" that the Intake Unit assignments, or that a reasonable employee would have been discouraged from complaining about discrimination by being assigned to perform strip searches.  Thus, the Court cannot say that she has demonstrated a triable issue as to whether those reassignments constituted adverse actions.

Ms. Andrews' termination, on the other hand, is clearly an adverse employment action, and thus, the Court turns to the first and third elements of the *prima facie* case – that is, whether there is a causal connection between her termination and any protected activity she engaged in. Typically, a causal connection is shown by close temporal proximity between the protected conduct and the adverse action. *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).

Ms. Andrews has adequately demonstrated a causal connection between her protected conduct and her termination. The Court points out two notable examples. First, GEO learned on March 31, 2008 that Ms. Andrews had filed an EEOC charge alleging race discrimination. The very same day, Warden Hunt prepared the initial memo seeking Ms. Andrews' termination. Notably, that memo expressly referenced the EEOC charge, and provided no other colorable justification for seeking Ms. Andrews' discharge. Thus, the memo is strongly persuasive evidence that Warden Hunt harbored a retaliatory motive. Second, Warden Hunt contacted Dr. Quick only a few days after Ms. Andrews gave an affidavit in the BICE investigation of racial abuse at the facility. This, too, is sufficiently close in time to Ms. Andrews' protected conduct to permit an inference of retaliation.

Accordingly, the burden shifts to GEO to articulate a non-retaliatory reason for Ms. Andrews' termination. It relies on Dr. Quick's conclusion that Ms. Andrews could not perform certain functions that GEO contended were essential to Ms. Andrews' job. Thus, the Court turns to the question of whether Ms. Andrews can establish that this proffered reason is a pretext for retaliation. As discussed in more detail below, there is evidence to suggest that the tasks Dr. Quick stated Ms. Andrews could not perform – emergency response and carrying more than 40 lbs. for extended periods of time – are not actually essential functions of Ms. Andrews' position.

Those facts, plus the strong inference of retaliation established by the temporal proximity in this case, create a triable issue of fact as to whether Ms. Andrews' termination was the result of unlawful retaliation.  Thus, GEO's request for summary judgment on Ms. Andrews' retaliation claims is denied.

### D.  Disability Discrimination

1. <u>Failure to accommodate</u>

The ADA provides that an employer "shall not discriminate against a qualified individual on the basis of [a] disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Implicit in that prohibition is a requirement that an employer make "reasonable accommodation" for an employee's disability, if doing so will permit the employee to perform the essential functions of the job.  *Thomas v. Avis Rent a Car*, 408 Fed.Appx. 145, 152 (10th Cir. 2011) (unpublished), *citing Wilkerson v. Shinseki*, 606 F.3d 1256, 1265 (10th Cir. 2010).   The employer is obligated to enter into an "interactive process" with an employee in order to ascertain whether it is possible to make an appropriate accommodation.  *Id.*  However, the employer is not obligated to remove essential functions from a position in order to accommodate a disabled employee.  *Id. citing Matthews v. Denver Post*, 263 F.3d 1164, 1168-69 (10th Cir. 2001).

To establish a claim of disability discrimination under a failure to accommodate theory, an employee must show: (i) that she is disabled within the meaning of the ADA; (ii) that she is qualified, with or without reasonable accommodation, to perform the essential functions of her job; and (iii) that the employer discriminated against her because of her disability. *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003).  Here, the parties concede that, for

purposes of this motion, Ms. Andrews is disabled; the question presented is whether she has come forward with evidence that she can perform the essential functions of the Detention Officer job, with or without reasonable accommodation.

There is no dispute that GEO identified to Dr. Quick what it contended were the essential functions of the job of Detention Officer, and that Dr. Quick identified certain of those functions that Ms. Andrews could not perform.  However, Ms. Andrews contends that the functions identified by GEO and identified by Dr. Quick are not, in fact, essential to the position. With regard to the various requirements that she be able to perform "emergency response, " she points to the affidavit of Ms. Underwood, who states that "any time there was a fight between detainees . . . detention officers would generally call a code yellow and GEO engaged other first responders and second responders to address the matter."  She states that GEO supervisors were "fully aware and on notice" that various Detention Officers "could not and would not physically restrain a detainee."  This evidence, taken in the light most favorable to Ms. Andrews, suggests that exercising physical control of inmates is not essential to providing "emergency response."[12]

Similarly, there is some evidence that the requirement that Ms. Andrews be able to lift more than 40 pounds is not necessarily an essential function of the Detention Officer job.  Ms. Andrews points out that she had several lifting restrictions imposed upon her over the course of her career with GEO, yet GEO was always able to accommodate those restrictions.  Indeed, she was assigned to work in the dormitories in January 2008 at a time when she had a 10-pound

---

[12]This highlights an additional problem with GEO's reliance on Dr. Quick: there is substantial ambiguity in some of the description of the "essential functions" that it identified for Dr. Quick's review, and no indication that Dr. Quick's conception of "emergency response" is necessarily the same as the actual expectations on Detention Officers.

lifting restriction.  Under these circumstances, Ms. Andrews has demonstrated a triable issue of fact as to whether the requirement that she be able to provide emergency response or lift more than 40 pounds are truly essential functions of the Detention Officer job.

There is no dispute that, after receiving Dr. Quick's report, GEO did not attempt to engage in any interactive process with Ms. Andrews or otherwise explore whether her restrictions indeed affected her ability to perform the essential functions of her job.  Thus, because there is a genuine dispute of fact as to whether Ms. Andrews could perform the **actual** essential functions of her job, with or without reasonable accommodation, the Court finds that her disability discrimination claim premised on a failure to accommodate theory must proceed to trial.

### 2. Retaliation

Like § 1981 and Title VII, the ADA prohibits retaliation against employees who engage in conduct protected by that Act.  42 U.S.C. § 12203(a).  The analysis of an ADA retaliation claim parallels that of a Title VII retaliation claim.  *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011).

The Court's analysis with regard to Ms. Andrews' Title VII/§ 1981 retaliation claim applies with nearly equal force to her ADA retaliation claim, with one notable exception.  Her March 2008 EEOC charge asserted both race-based and disability-based discrimination, and thus, constituted protected conduct under the ADA as well as under Title VII.  Thus, Warden Hunt's actions in immediately drafting a proposal to terminate Ms. Andrews in response to that charge provide a strong inference of retaliatory intent that would violate the ADA as well as Title VII/§1981.

However, Ms. Andrew's protected conduct in October 2008 – her interview with BICE about race discrimination in the facility – was protected conduct under Title VII, but had no apparent connection to the ADA. One might argue, then, that Ms. Andrews' actual termination in October 2008 is too temporally remote from her only disability-related protected conduct in March 2008 to permit an inference of causation. The Court disagrees. The record reflects that Warden Hunt's efforts to secure Ms. Andrews' termination began in March 2008, and persisted as an ongoing objective until that termination was ultimately achieved in October. At no time did Warden Hunt withdraw her attempt to seek Ms. Andrews' termination. Rather, in April 2008, GEO decided to "hold off" – not abandon – the attempt to terminate Ms. Andrews, "until we get a better handle on her current issue." In a May 5, 2008 e-mail, Warden Hunt stated "I am following up on the terminations for . . . [Ms.] Andrews. Please give me an update." In an August 13, 2008 e-mail, Ms. Culbertson notes that Ms. Andrews "has a termination pending from 4/8/2008," suggesting that Warden Hunt's intention to seek Ms. Andrews' termination remained extant through that date. Under these circumstances, there is a genuine dispute of fact as to whether Ms. Andrews' October 2008 termination was simply the culmination of a plan that was put into effect by Warden Hunt in April 2008, immediately after Ms. Andrews made a claim of disability discrimination, suggesting a causal connection between the two events.

Accordingly, the Court finds that Ms. Andrews' ADA retaliation claim should proceed to trial.

**E. Common-law claims**

Ms. Andrews also asserts claims under Colorado law for wrongful discharge in violation of public policy and outrageous conduct. GEO asserts that to the extent such claims are

predicated on the same conduct that underlies Ms. Andrews' viable statutory claims, the common law claims are effectively preempted.

GEO's contention is well-taken.  In *Thomas v. National Ass'n of Letter Carriers*, 225 F.3d 1149, 1158 n. 10 (10th Cir. 2000), the court held that a claim for wrongful discharge in violation of public policy under Kansas law was effectively preempted by the employee's pending claim of religious discrimination under Title VII.  *See also Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159, 1175-76 (10th Cir. 1998) (same result under Oklahoma law). This Court sees no reason why the result should not be the same under Colorado law.  Federal anti-discrimination laws reflect public policy against discrimination, but balanced against a carefully-constructed remedial scheme.  Allowing an employee to evade that remedial scheme, while still invoking the public policy components, disrupts the balance struck by Congress. Accordingly, the Court grants GEO's request for summary judgment on Ms. Andrews' wrongful discharge claim.

Similarly, the Court has previously held that common-law outrageous conduct claims may not lie where they are predicated on the same conduct supporting a Title VII claim. *Emerson v. Wembley USA, Inc.*, 433 F.Supp.2d 1200, 1228 (D. Colo. 2006).  To the extent Ms. Andrews' contentions state a cognizable Title VII or ADA claim, the Court finds her outrageous conduct claim essentially preempted.  To the extent her allegations are insufficient to state a statutory claim, the Court finds those allegations do not present conduct that rises to the level of outrageousness necessary to state the claim under state law.  Accordingly, GEO is entitled to summary judgment on this claim as well.

## CONCLUSION

For the foregoing reasons, GEO's Motion for Summary Judgment **(# 63)** is **GRANTED IN PART**, insofar as GEO is entitled to summary judgment on Ms. Andrews' claims of a racially-hostile working environment under both § 1981 and Title VII, her claim of disparate treatment under both § 1981 and Title VII, and her common-law claims for wrongful discharge and outrageous conduct, and **DENIED IN PART**, insofar as there are triable claims that her termination was unlawful retaliation based on her complaints of race discrimination under § 1981 and Title VII, and complaints of disability discrimination under the ADA, as well as a triable claim that her termination constituted disability discrimination under a failure to accommodate theory.  The parties shall jointly contact chambers to schedule a Pretrial Conference on the claims that are proceeding to trial.

Dated this 28th day of September, 2012

BY THE COURT:

Marcia S. Krieger
United States District Judge

24